**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George C. DANIEL, Defendant–Appellant.**

No. 92–5518.

United States Court of Appeals,
Fourth Circuit.

Argued July 15, 1993.

Decided Sept. 1, 1993.

Amended by Order Filed Sept. 14, 1993.

William Kevin Reynolds, Annapolis, MD, argued (Bruce C. Bereano, on brief), for defendant-appellant.

Harvey Ellis Eisenberg, Executive Asst. U.S. Atty., Baltimore, MD, argued (Gary P. Jordan, U.S. Atty., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

## OPINION

PHILLIPS, Circuit Judge:

George Daniel appeals four convictions for unlawfully attempting to dispense or distribute controlled substances and the sentence accordingly imposed. Finding no reversible errors, we affirm the convictions and sentence, remanding however for correction of an administrative error in sentencing.

### I

Alex Dower, a long-time drug abuser, alerted the Drug Enforcement Administration (DEA) to his purchases of prescriptions for controlled substances from Dr. George C. Daniel after becoming annoyed with Daniel's refusal to extend his line of credit. The government then used Dower to set up a meeting of Daniel and Darren Wolpert, a DEA undercover agent who posed as Dower's brother Robert. At a meeting that

formed the basis for Count One of Daniel's indictment, Wolpert and Dower met Daniel, who wrote a prescription for Percodan Wolpert requested within three minutes and without any physical examination. While Daniel initially expressed a desire to prescribe Tylenol III (also a controlled substance), he acquiesced immediately when Wolpert said he wanted Percodan. Wolpert paid off Dower's $275 debt to Daniel (this was the government's only payment to Dower) and gave Daniel an additional $75.

Ten days later Wolpert contacted Daniel directly. Within six minutes of meeting Daniel for the two transactions charged in Counts Two and Three of his indictment, Wolpert had acquired two more prescriptions he'd requested: Percodan for himself and Dilaudid for a person Daniel hadn't met, Bill McCallam (a.k.a. DEA Special Agent William Callahan). Again Wolpert wasn't examined. Wolpert paid Daniel $100 for each of the two prescriptions.

Wolpert and another undercover DEA agent, Angela Stone, met Daniel at his office a few days later to conduct the transactions charged in Counts Four through Seven of Daniel's indictment. By then confident that Daniel wouldn't examine him, Wolpert wore a recording device. In fifteen minutes Daniel sold Wolpert four requested prescriptions: Percodan for Robert Dower, Dilaudid for Bill McCallam (who still hadn't met Daniel), Demerol for Alex Dower (who wasn't present), and Dilaudid for Angela Steinhart (a.k.a. Agent Stone). Once again, Daniel conducted no exams and took no medical histories. Though he asked Stone about the nature of her medical problem, he seemed unconcerned when she replied simply that Dilaudid helped her feel better and she liked the way it made her feel. Wolpert reassured him that Stone was all right, that he'd "been with her for a while," and Daniel wrote the prescription. Wolpert paid Daniel $300 and Stone paid him $100. During the encounter, Daniel cautioned Wolpert and Stone to use different pharmacies to fill the various prescriptions and made other statements about avoiding DEA scrutiny.

Counts Eight through Eleven of Daniel's indictment arose from Daniel's recorded encounter twenty-two days later with Agent Callahan. Acting alone, Callahan purchased four prescriptions for $400 in twelve minutes, without medical attention of any kind, for Bill McCallam, Robert Dower, Ernie Staples, and Jerry Campbell. Daniel had never met the imaginary Staples and Campbell. He warned Callahan to fill the prescriptions at different pharmacies.

In 1987 Daniel was indicted by a federal grand jury in the District of Maryland on eleven counts of unlawfully attempting to dispense controlled substances. 21 U.S.C. §§ 841(a)(1), 846. After agreeing to plead guilty to one of those counts, Daniel became a fugitive from justice until his arrest three and a half years and thirty-one countries later in Hawaii. In May, 1992 he was tried to a jury in the District of Maryland, which found him guilty on Counts Five, Six, Seven, and Ten, but acquitted him on Counts One and Two and hung on Counts Three, Four, Eight, Nine, and Eleven. The district court declared a mistrial on the hung counts and the United States dismissed them with leave of the court.

The district court then sentenced Daniel to concurrent 52 month sentences on each count. The sentences are pre-Guidelines and Daniel will be eligible for parole.

Daniel appealed, pressing a number of claimed errors. In essence, he (1) challenges the sufficiency of his indictment, (2) alleges that he was unlawfully entrapped and wrongfully prevented from arguing that to the jury, (3) contends that his counsel was constitutionally ineffective, and (4) notes a number of objections to his sentencing. In Parts II through V of the opinion we address this multitude of claims, taking them in the order noted above.

## II

■ Daniel unsuccessfully challenged his indictment below and renews that challenge here. Each count of his indictment charged that

> George C. Daniel, M.D.[,] being a registrant authorized to dispense controlled substances for legitimate medical purposes, did knowingly and intentionally un-

lawfully attempt to dispense or distribute a quantity of a Schedule II Controlled Substance ...; said attempt not being for a legitimate medical purpose.

Daniel contends that this charge failed to include certain essential elements of the relevant offense, a violation of 21 U.S.C. § 841(a)(1), and was thus fatally flawed. The elements claimed to be missing are (1) action outside the usual course of medical practice, (2) action not in good faith and proper accordance with a standard of medical practice generally recognized and accepted in the United States, and (3) action by a practicing physician. For the reasons below, we find the indictment sufficient.

Daniel was charged under the relevant attempt statute, 21 U.S.C. § 846, for attempts to commit the substantive offense proscribed by 21 U.S.C. § 841(a)(1):

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally to ... distribute[ ] or dispense[ ] a controlled substance ...

Section 822(b) of the relevant subchapter authorizes distribution and dispensation by registrants like Daniel "to the extent authorized by their registration and in conformity with the other provisions of this subchapter." In *United States v. Moore*, 423 U.S. 122, 140, 96 S.Ct. 335, 344, 46 L.Ed.2d 333 (1975), the Supreme Court limited this authority to distributions and dispensations in the lawful course of approved professional practice.

As we interpret the statute, its elements are (1) a knowing or intentional attempt to distribute or dispense (2) a substance known to be controlled (3) in a way not authorized by this subchapter. All Daniel's complaints relate to the third element recited. With respect to physicians, demonstrating that element requires proof that the charged conduct falls outside the boundaries of the registrant's professional practice. *Moore*, 423 U.S. at 140, 96 S.Ct. at 344. The indictment's allegations that the attempted distributions or dispensations were "not ... for a legitimate medical purpose" satisfy that requirement. No more is necessary. The first two of Daniel's "missing elements" simply repeat this requirement in other, less concise, terms. The third, that Daniel was a

physician, need not be proven by the government. On the contrary, it is the source of the requirement that the government show a lack of legitimate medical purpose at all. Accordingly, we find the indictment sufficient.

### III

In addition to challenging his indictment, Daniel claims he was entrapped. The district court rejected this defense and refused to instruct the jury on entrapment, concluding that Daniel hadn't met his burden of production on the issue. Daniel argues he met that burden and, moreover, was entitled to a judgment of acquittal on all counts because the government failed to present sufficient evidence from which the jury could conclude beyond a reasonable doubt that he was predisposed to commit the crimes charged. At the very least, he contends, the jury should have been instructed on and permitted to consider his entrapment defense. We disagree and conclude, as did the district court, that Daniel failed to meet his burden of production on this issue.

### A

An entrapment defense has two elements: government inducement and lack of predisposition to commit the crime on the defendant's part. *Mathews v. United States*, 485 U.S. 58, 62–63, 108 S.Ct. 883, 886–887, 99 L.Ed.2d 54 (1988). To raise this affirmative defense a defendant must produce more than a scintilla of evidence that the government induced him to commit the charged offense. *United States v. Perl*, 584 F.2d 1316, 1321 (4th Cir.1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979).

Daniel didn't do that. We see no inducement in the conduct of the government agents here. "Inducement" is a term of art: it involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party. *See Jacobson v. United States*, ⸺ U.S. ⸺, ⸺, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992). Solicitation, by contrast, is the provision of an opportunity to commit a criminal act. *See id.* The

agents' transactions with Daniel involved only the latter.

Daniel cites the government's failure to investigate Alex Dower and Agent Wolpert's "admission" that he induced Daniel to commit the initial offense as evidence of governmental overreaching and excessive conduct, but we are unpersuaded. The government's investigation of *Daniel* was thoroughly professional, regardless where it received the undoubtedly accurate information that he unlawfully sold prescriptions, and Wolpert's supposed "admission" was merely the inartful product of artful cross-examination: he conceded that what he did sounded like the *dictionary* definition of "induce."

The undercover DEA agents who purchased prescriptions from Daniel didn't have to plead, argue, or coerce a reluctant defendant into unlawfully selling a prescription. While Daniel refused to commit some illegal acts and expressed reluctance to commit others, the government agents never did more to overcome these refusals or expressions of reluctance than remind him that there was money to be made and promise to avoid arousing the attention of the authorities. Frequently this was enough. When it wasn't, no further cajoling took place. Our precedents leave no doubt that the mild forms of persuasion deployed here don't present evidence of inducement. *United States v. De Vore*, 423 F.2d 1069, 1071 (4th Cir.1970), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971); *see also United States v. Osborne*, 935 F.2d 32, 39 (4th Cir. 1991); *United States v. Hunt*, 749 F.2d 1078, 1085–86 (4th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985).

In sum, the government's conduct was insufficient as a matter of law to raise an issue of inducement, and the district court's refusal to send the entrapment defense to the jury or grant a judgment of acquittal on that basis was entirely proper.

### B

■ Daniel also argues that the government's undercover investigation of his activities involved conduct by law enforcement officers "so outrageous as to shock the conscience of the court." *Osborne*, 935 F.2d at 36. If so, this would violate Daniel's due process rights and bar his prosecution. *Id.* The conduct's outrageousness is said to lie in the government's reliance on the tip of an informant who was also a drug addict suffering withdrawal and its alleged deception and failure adequately to record and preserve its conversations with Daniel and other related evidence.

We find no due process violation. Cases may exist where the conduct of law enforcers is "so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction," *see United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973) (suggesting the possibility), but they are rare indeed. This is not one such. The law enforcement techniques relied upon in this operation and others like it may offend the sensibilities of some, but they are manifestly legal. This claim of error lacks merit.

### IV

■ Daniel's final challenge to his convictions asserts that he received constitutionally ineffective assistance of counsel. We disagree. Daniel's counsel secured acquittal on two of the eleven counts against him and a hung jury mistrial with respect to five others, despite overwhelming evidence of guilt with respect to most of them. Two of trial counsel's failures to act cited by Daniel as evidence of ineffectiveness—failure to seek dismissal of the indictment based on a dubious construction of the charging statute and failure to seek judgments of acquittal on the counts of conviction for inconsistency with the jury's "not guilty" findings on other counts—demonstrate his sound evaluation of their likelihood of success, and the third, failure to move the district court to attach its written determination not to rely on certain information at sentencing, was neither prejudicial nor sufficiently serious to qualify as ineffective assistance under the standard laid down in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Accordingly, we reject this claim.

V

Finally, Daniel raises a number of issues concerning his sentencing. First, he argues that the district court improperly failed to insure that he'd had an opportunity to read and discuss his presentence investigation report (PSI) with counsel prior to sentencing. Second, he seeks to convince us that the district court's failure to attach to his PSI its determination not to rely on certain heroin equivalency data in sentencing involved reversible error. Third, he claims that whatever it said, the district court nonetheless improperly did rely on that inaccurate information, thereby violating his due process rights and committing reversible error. We take each of these contentions in turn.

A

■ The district court failed to ask Daniel whether he'd had an opportunity to read and discuss his PSI with counsel before sentencing. Daniel contends this is reversible error, but we disagree.

The omitted query is recommended but not required in this circuit. *United States v. Miller*, 849 F.2d 896, 897–98 (4th Cir.1988). Its absence, however, requires reversal unless the record contains information from which the district court properly could have made the determination without asking the defendant. *Id.*

This record contains such information. It shows that Daniel interrupted his counsel several times during the sentencing proceeding to correct his misstatements and in his allocution discussed in detail the results of his own independent research into case law regarding the sentencing of similarly situated defendants, both before and after the application of the United States Sentencing Guidelines,[1] as well as his research into other sentences recommended by the specific probation officer who prepared his PSI. In discussing the latter, he told the court that his attorney had advised him against discussing the probation officer's prior sentencing decisions. As the government suggests, a fair reading of the record shows that the defendant not only read the PSI but also discussed it with his counsel. Therefore we reject this claim of error.

B

■ Daniel also argues that the district court violated Fed.R.Crim.P. 32(c)(3)(D) [2] by failing to append to his PSI its determination not to rely on a contested heroin equivalency figure in sentencing him. The government counters that the calculation was correct, that the figure related only to probation in this pre-Guidelines case, and that Daniel suffered no prejudice from this failure. While it's true that the figure in question affected only Daniel's parole classification, our holding in *United States v. Miller*, 871 F.2d 488, 489 (4th Cir.1989), makes clear that Rule 32(c)(3)(D)'s command is prophylactic in nature. We will remedy any failure to comply with it, whether or not the district court actually resolved the issue and whether or not any identifiable harm was suffered, but the remedy provided is simply a remand for attachment of the district court's determination not to rely on the disputed information and transmission of the revised PSI to the Bureau of Prisons and the Parole Commission. That we will order.

C

Finally, we consider Daniel's claim that the district court improperly relied on the heroin equivalency data in sentencing. This claim's underpinnings rest on the fact that the government argued for sentencing by analogy to the United States Sentencing Guidelines even if they did not, by their terms, apply. The district court, however, expressly disclaimed any reliance on the Guidelines and the heroin equivalency figures. It imposed a sentence in this pre-Guidelines case well under the statutory maximum and amply justified by the other considerations noted by the Assistant United States Attorney at sentencing. Accordingly, we find this third and final claim of sentencing error meritless.

1. Applicability of the Guidelines was an issue at sentencing below.

2. Daniel's claim is based on the Rule relating to crimes committed prior to November 1, 1987. It has since been amended.

## VI

Having found no reversible error in Daniel's trial or sentencing, we affirm his convictions and the sentence imposed. We remand the cause to the district court to permit emendation of the PSI in accordance with Part V.B of this opinion and the PSI's subsequent retransmission to the proper authorities.

*SO ORDERED.*