**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ram SINGH, Defendant–Appellant.**

No. 94–5073.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1994.

Decided June 1, 1995.

**ARGUED:** Carl E. McAfee, McAfee, Bledsoe & Associates, P.C., Norton, VA, for appellant. Julie Marie Campbell, Asst. U.S. Atty., Abingdon, VA, for appellee. **ON BRIEF:** Robert P. Crouch, Jr., U.S. Atty., Abingdon, VA, for appellee.

Before LUTTIG and WILLIAMS, Circuit Judges, OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed in part, reversed in part, and remanded for resentencing by published opinion. Judge WILLIAMS wrote the opinion, in which Judge LUTTIG and Judge OSTEEN joined.

**OPINION**

WILLIAMS, Circuit Judge:

In October 1993, a jury in the United States District Court for the Western District of Virginia convicted Dr. Ram Singh of distributing controlled substances outside the scope of a medical practice for other than legitimate medical purposes in violation of 21 U.S.C. § 841(a) (1988), and of furnishing false information in a drug prescription in violation of 21 U.S.C. § 843(a)(4)(A) (1988). On appeal, Dr. Singh challenges both his conviction and the calculation of his sentence. We conclude that the evidence was sufficient to convict on all counts, that the district court properly denied Dr. Singh's request for an entrapment instruction and his motion for a new trial, and that the district court properly calculated Dr. Singh's sentence using the gross weight of the controlled substances rather than the weight of their active ingredients. We conclude, however, that the district court failed to articulate sufficient factual findings to increase Dr. Singh's base offense level pursuant to the "vulnerable victim" adjustment of U.S.S.G.[1] § 3A1.1, and, therefore, remand for resentencing.

I.

In 1987, Tim Alley, a pharmacist in Clintwood, Virginia, noticed that Dr. Singh was issuing prescriptions for controlled narcotics at a much faster rate than most other physicians in the vicinity. Mr. Alley suspected that Dr. Singh may have been overprescribing medicine to his patients, so he filed a complaint with the Virginia Board of Pharmacy. The Board, in turn, reviewed Mr. Alley's records concerning Dr. Singh's patients.

In 1991, two separate incidents again brought Dr. Singh to the attention of the Virginia authorities. First, the Virginia State Police received a complaint from Ms. Melissa Mullins reporting that Dr. Singh had offered her drugs in exchange for sexual intercourse. The police followed up on this report by having Ms. Mullins see Dr. Singh again—this time wearing a recording device—where she captured Dr. Singh's proposition on tape and obtained two prescriptions for controlled narcotics without complaining of any ailments. The Virginia State Police happened upon the second incident by accident. Vickie Justice was caught with a prescription that she had forged with Dr. Singh's name. Ms. Justice was not only a former patient of Dr. Singh, she was also his former lover. To avoid prosecution for forgery and uttering, Ms. Justice agreed to work with the authorities in their investigation of Dr. Singh. With a tape recorder in her purse, Ms. Justice obtained a prescription from Dr. Singh for Percocet, a Schedule II narcotic, in exchange for sexual intercourse. At Ms. Justice's request, Dr. Singh wrote the prescription in the name of Ms. Justice's grandfather, Edward May, an indi-

---

1. United States Sentencing Commission, *Guidelines Manual* (Nov.1993).

vidual whom Dr. Singh never had examined or met.

In conjunction with its investigation of Dr. Singh and as a result of the Virginia Board of Pharmacy's inquiries, the Pharmaceutical and Drug Diversion Investigative Unit of the Virginia State Police obtained Dr. Singh's prescription records through a pharmacy survey of the area. From these records, the State Police isolated approximately one hundred patients that it suspected were the recipients of Dr. Singh's illegal distribution of scheduled narcotics. The Virginia State Police then obtained a search warrant for Dr. Singh's office. During this search, the files of the previously identified one hundred patients were seized.

The grand jury indicted Dr. Singh on twenty-four counts of knowingly, intentionally, and unlawfully distributing controlled substances outside the scope of his professional medical practice in violation of 21 U.S.C. § 841(a). Based on the prescription he wrote to Ms. Justice in her grandfather's name, Dr. Singh was also charged with one count of furnishing incorrect information in medical and pharmaceutical documents in violation of 21 U.S.C. § 843(a)(4)(A). He pled not guilty to all charges.

On October 7, 1993, the jury convicted Dr. Singh on seventeen of the twenty-five counts. Believing that Ms. Justice had been intimidated into testifying, Dr. Singh then made a motion for a new trial based on after-discovered evidence, which the district court subsequently rejected. At the sentencing hearing, the district court determined a base offense level of 20 based on the gross weight of the drugs distributed in the sixteen distribution counts of which Dr. Singh was convicted. The court adjusted upward two levels pursuant to U.S.S.G. § 3B1.3 because Dr. Singh abused a position of trust. The district court determined that Dr. Singh had a criminal history category of I, which combined with his total offense level of 22, placed Dr. Singh in a guideline range of 41–51 months. The district court also agreed with the Government's objections to the pre-sentence report and found that Dr. Singh had preyed upon unusually vulnerable victims. The court therefore upwardly adjusted the offense level

two levels under U.S.S.G. § 3A1.1. This new calculation gave Dr. Singh a guideline range of 51–63 months. The district court sentenced him to concurrent terms of 51 months incarceration and a three year term of supervised release. The court further ordered him to pay a fine of $30,000. Dr. Singh appeals both his conviction and his sentence.

## II.

Dr. Singh raises three challenges to his conviction. First, he argues that the evidence was insufficient to prove that the prescriptions he wrote were outside the course of a professional medical practice. Second, he appeals the district court's refusal to give the jury an entrapment instruction. Finally, he insists that the district court should have granted a new trial based on newly discovered evidence. We address each of these trial related issues in turn.

## A.

■ In reviewing whether the evidence was sufficient to convict a defendant, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, (1979) (emphasis in original); *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995). As we recently stated in *Murphy*, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *Murphy*, 35 F.3d at 148. Therefore, "[i]f there is substantial evidence to support the verdict, after viewing all of the evidence and the inferences therefrom in the light most favorable to the Government, . . . we must affirm." *Id.* (citations omitted).

■ To convict a physician of distributing a controlled substance in violation of § 841, the Government must prove the fol-

lowing three elements. First, it must show that the defendant "distributed or dispensed a controlled substance." *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1141 (4th Cir.1994). Second, it must prove that, in doing so, "he acted knowingly and intentionally." *Id.* Finally, and most importantly for our purposes, the evidence must show that the defendant's "actions were not for legitimate medical purposes in the usual course of his professional medical practice or [were] beyond the bounds of medical practice." *Id.* As the Sixth Circuit has noted, "[t]here are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice. Rather, the courts must engage in a case-by-case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts." *United States v. August*, 984 F.2d 705, 713 (6th Cir.1992) (citations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 158, 126 L.Ed.2d 119 (1993); *see also Tran Trong Cuong*, 18 F.3d at 1137–38. Dr. Singh challenges the sufficiency of the evidence on the third element as to most of his § 841(a)(1) convictions.

■ Dr. Singh argues that, at best, the evidence in all the challenged counts shows only a difference of medical opinion. He contends that each one of these patients came to him with a serious medical need that he diagnosed and properly treated with medication. If some of them were lying about the extent of their pain or ailment, he was unable to tell. All in all, Dr. Singh argues that "[t]here was no evidence that [he] did not act in good faith in the honest exercise of his best professional judgment as to these patients' needs." (Brief of Appellant at 15–16.) We disagree.

The patients concerned in all but two of the § 841 counts testified at trial. Each one testified that he or she developed an addiction to scheduled narcotics (or a behavior tantamount to an addiction) either before or during their treatment from Dr. Singh. Dr. Singh continued to prescribe addictive drugs to each one of these patients after he became aware (or should have become aware) of their addictions.[2] Additionally, the Government's expert, Dr. Adam Steinberg, testified with particularity about the effects of all the drugs Dr. Singh had prescribed, as well as their proper uses in general, the legal requirements for issuing a prescription, and the inappropriateness of the prescriptions in each of the § 841 counts.[3] The jury was

---

2. For instance, during direct examination, Charles Hall, the subject of count 14, testified as follows:

Q: Mr. Hall, do you recall at any time asking for a prescription of Talacen?
A: Yeah.
Q: Why did you ask for a prescription for Talacen?
A: Some people said it was better [than Ativan].
Q: Did Dr. Singh write your prescription for Talacen?
A: I'm pretty sure.
Q: Mr. Hall, you're an alcoholic; is that correct?
A: Yes.

 * * * * * *

Q: [D]id you make Dr. Singh aware of your alcoholism?
A: Yeah.

 * * * * * *

Q: Would [Dr. Singh] write you what you asked for?
A: Most of the time.
(J.A. 95–96.)

3. Again, we look to Charles Hall, the subject of Count 14, for an example. After establishing that he had reviewed the information relating to Mr. Hall, Dr. Steinberg described Dr. Singh's treatment of Mr. Hall as follows:

Q: Have you reached a medical opinion as to whether or not the prescriptions issued for Mr. Hall during a period of time indicated were for legitimate medical purpose and in the course of professional medical judgment?
A: They do not appear to be.
Q: What is the basis of your opinion?
A: The diagnoses are migraine, chronic back pain, psoriasis, seizures. Again, no other attempt at therapy was made. If the patient has significant lung disease [which Mr. Hall had], any of the narcotics run a risk because they tend to depress the breathing. It would put him in danger of stopping breathing.
Q: What was significant about Mr. Hall's medical record and these prescriptions? ...
A: He was prescribed large quantities of Benzodiazepam tranquilizer, hypnotics and Tylenol with Codeine at the same time on most occasions.
Q: In fact, looking at his prescriptions from January 15, 1990 to December of 1990, do you

properly instructed as to the elements and nuances of this offense. Considering the great deference we must pay to the jury and viewing the evidence in the light most favorable to the Government, we cannot say that the evidence was insufficient to convict on these counts.

Dr. Singh also argues that under our decision in *Tran Trong Cuong,* a doctor cannot be convicted under § 841(a) unless the person to whom he prescribed the controlled substance testifies at trial. Therefore, he contends that the evidence was insufficient to convict in Counts 17 and 19 because each of the patients to whom the medicine was prescribed did not testify at trial. This argument, however, misreads *Tran Trong Cuong.*

In *Tran Trong Cuong,* we reversed the convictions, not because the victims did not testify, but rather because their lack of testimony was not replaced by any substantive evidence. In that case, the government was attempting to prosecute more than one hundred counts against a sole defendant. The only evidence in a majority of the counts consisted of the prescriptions, a summary of evidence taken from the defendant's files, and an expert witness who did not discuss each count individually. 18 F.3d at 1141. Essentially, the Government attempted to prove its case by generalizing. In reversing, we noted that "[a] defendant is entitled to individual consideration of every count in an indictment by the jury." *Id.* at 1142.

None of these circumstances is present here. In both Count 17 and Count 19, Dr. Steinberg individually analyzed Dr. Singh's medical practices, the prescriptions given, and whether they were called for. In Count 17, Dr. Steinberg noted that Ruth Mullins was diagnosed as having "cluster headaches," yet, Dr. Singh had prescribed a narcotic medication for her. Dr. Steinberg stated

that "the use of narcotic medicine in [treating] cluster headaches is worthless because the headache generally lasts less than an hour. By the time the drug is in the system, the headache is already gone." (J.A. 420.) Furthermore, Dr. Singh indicated that these narcotics would only "make an individual less coordinated." *Id.* He also observed that Dr. Singh never referred Ms. Mullins to a specialist.

Regarding Count 19, Dr. Steinberg also testified with specificity as to Dr. Singh's diagnosis and treatment of Delbert Potter. Dr. Singh diagnosed Mr. Potter with lumbar disc problems and seizures, for which he prescribed Valium and Tylenol with Codeine. Dr. Singh's file showed that Mr. Potter had been admitted to a hospital for alcohol abuse. During that admission, Mr. Potter had a psychiatric evaluation, which recommended that Mr. Potter be placed on anti-abuse and anti-depressant therapy. Notwithstanding this recommendation, Dr. Singh continued to prescribe Tylenol and Valium to Mr. Potter. Dr. Steinberg concluded from this information that Dr. Singh was acting outside the scope of a legitimate medical practice. We therefore find that the evidence sufficiently particularizes both Counts 17 and 19 so that the jury could come to an individualized conclusion on each count in accordance with *Tran Trong Cuong.*

■ In sum, although the testimony does not adduce compelling evidence that Dr. Singh prescribed with malicious motive or the desire to make a profit, those motivations, though common in § 841(a)(1) prosecutions, are not required to convict. *See Tran Trong Cuong,* 18 F.3d at 1137 (noting that § 841(a)(1) was violated when the doctor's "authority to prescribe controlled substances was being used not for treatment of a pa-

---

have an opinion as to the quantity of Ativan and Tylenol and Halcion prescribed?
A: They're excessive.
Q: And the effect that they would have or probable effect they would have on a patient like Mr. Hall with breathing problems?
A: They would depress his breathing, make him more prone to respiratory infections, difficulty with breathing in general.
Q: Dr. Steinberg, is it appropriate to prescribe Ativan and Halcion, Tylenol # 4 for

someone who is diagnosed with acute bronchial spasms?
A: No.
Q: And seizures?
A: No.
Q: And if that were done, would it be outside the course of professional medical treatment?
A: Yes. Acute bronchial spasm implies asthma, and that combination would be a pretty big risk.
(J.A. 415–17.)

tient, but for the purpose of assisting another in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose"). Congress has given Dr. Singh the power to authorize the distribution of dangerous addictive drugs, and with that power, Congress also places upon him the responsibility to distribute them wisely within the course of his medical practice. The evidence clearly shows that Dr. Singh abused this power, and, therefore, we affirm the sufficiency of the evidence to convict.

### B.

▪▪▪▪ Next, Dr. Singh argues that the district court erred by refusing his request for a jury instruction on entrapment for Count 5, which charged Dr. Singh with writing a false prescription for Vickie Justice's grandfather, Edward May. "An entrapment defense has two elements: [1] government inducement and [2] lack of predisposition to commit the crime on the defendant's part." *United States v. Daniel,* 3 F.3d 775, 778 (4th Cir.1993) (citing *Mathews v. United States,* 485 U.S. 58, 62–63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988)), *cert. denied,* — U.S. ——, 114 S.Ct. 1101, 127 L.Ed.2d 413 (1994). In order to receive an entrapment defense instruction, the defendant must produce "sufficient evidence from which a reasonable jury could find" that the government induced him to commit the charged offense. *Mathews,* 485 U.S. at 62, 108 S.Ct. at 886; *United States v. Perl,* 584 F.2d 1316, 1321 (4th Cir. 1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979). The district court's decision not to give an entrapment instruction is a question of law which we review *de novo. United States v. Ortiz,* 804 F.2d 1161, 1164 & n. 2 (10th Cir.1986); *see also United States v. Perrin,* 45 F.3d 869, 871 (4th Cir.1995) (affirming a refusal to instruct on a defense of justification).

▪▪▪▪ Singh argues that Ms. Justice, acting as a government agent, induced him to write the false prescription for her "through the enticement of sex and other psychological manipulations." (Brief of Appellant at 18.) Furthermore, he argues he had no predisposition to write the false prescription as shown by the lack of evidence in the record that he ever wrote another false prescription. Although Dr. Singh must only proffer "more than a scintilla" of evidence to obtain an entrapment instruction, *Perl,* 584 F.2d at 1321, we do not think he has met this burden. In particular, we are drawn to the taped conversation between Dr. Singh and Ms. Justice in which Dr. Singh shows very little resistance to Ms. Justice's meager invitation to write the false prescription, and quite a predisposition to commit the crime:

> Dr. Singh: Um hum. What do you want? Lortab?
>
> Ms. Justice: No, I don't want Lortab.
>
> Dr. Singh: Then what?
>
> Ms. Justice: Well, I don't want Lortab in my name. You said you might give me Percocet.
>
> Dr. Singh: In whose name?
>
> Ms. Justice: You can put it in my mother's or grandfather's, whichever one.
>
> Dr. Singh: What's your grandfather's name?
>
> Ms. Justice: Edward May.
>
> Dr. Singh: Who?
>
> Ms. Justice: Edward May.
>
> Dr. Singh: Edward M-a-y?
>
> Ms. Justice: M-a-y.

(J.A. 281.) As we stated in *Daniel,* inducement "involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party," whereas, on the other hand, solicitation simply "is the provision of an opportunity to commit a criminal act." *Daniel,* 3 F.3d at 778. Even if Ms. Justice did pressure Dr. Singh to give her the prescription, her actions were nothing more than a solicitation to act, and certainly did not "implant a criminal design in the mind of an otherwise innocent party." *Id.* Furthermore, "the entrapment defense is of little use [here] because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Jacobson v. United States,* 503 U.S. 540, 550, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 174 (1992). When viewed in light of the entire record, this conversation very clearly shows Dr. Singh's

predisposition to commit the crime. The district court, therefore, properly denied Dr. Singh's request for an entrapment instruction.

### C.

■ Dr. Singh argues that the district court erred by refusing his request for a new trial based on after-discovered evidence. He claims that following the trial he learned that Ms. Justice was intimidated into acting as an informant against her will. Dr. Singh believes that this discovery merits a retrial. We disagree.

■ In *United States v. Custis,* 988 F.2d 1355 (4th Cir.1993), *aff'd,* — U.S. —, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994), we noted the hurdles a defendant must overcome to receive a new trial based on newly discovered evidence:

(a) [T]he evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied upon must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Id.* at 1359 (quoting *United States v. Bales,* 813 F.2d 1289, 1295 (4th Cir.1987)). Without ruling out the possibility that a rare example might exist, we have never allowed a new trial unless the defendant can establish all five elements. *Id.; United States v. Chavis,* 880 F.2d 788, 793 (4th Cir.1989). We review the district court's decision not to grant a new trial for an abuse of discretion. *Abasiekong v. City of Shelby,* 744 F.2d 1055, 1059 (4th Cir.1984).

Assuming *arguendo* that the first four elements of the *Custis* test are satisfied, we find that the district court did not abuse its discretion in denying a new trial because Dr. Singh has not met his burden as to element (e). Even excluding every bit of Ms. Justice's testimony at trial, and impugning her motivation for wearing a wire, the evidence still overwhelmingly supports conviction. As to Counts 3 and 5, both of which arose from Ms. Justice's September 19, 1991, encounter with Dr. Singh, we cannot disregard the tape recording which was played for the jury and introduced into evidence. This is intractable proof that Dr. Singh both distributed Percocet to Ms. Justice and did so in her grandfather's name. As to Count 8, which accused Dr. Singh of distributing a variety of controlled substances to Ms. Justice over a period of six months in 1990, Dr. Steinberg testified with particularity as to whether these prescriptions were outside the course of a professional medical practice in light of Dr. Singh's diagnoses of Ms. Justice. Therefore, even without Ms. Justice's testimony, we cannot say that the district court abused its discretion in determining that this new evidence would not "probably produce an acquittal." *Custis,* 988 F.2d at 1359.

We therefore affirm the district court's rejection of Dr. Singh's motion for a new trial.

### III.

■ Dr. Singh also calls into doubt two aspects of his sentencing. First, he claims that the district court incorrectly applied the "unusually vulnerable victim" enhancement of U.S.S.G. § 3A1.1 by increasing his offense level by two. Second, he contends that we should reverse our interpretation of U.S.S.G. § 2D1.1(c), which currently requires calculation of a defendant's sentence by the gross weight of the drugs rather than the weight of their active ingredients. Applying the statutory command to give "due deference" to a district court's application of the sentencing guidelines, we review factual determinations for clear error and legal questions *de novo. United States v. Daughtrey,* 874 F.2d 213, 217–18 (4th Cir.1989). We address each of Dr. Singh's challenges in turn.

### A.

At sentencing, Dr. Singh received an additional two levels on his base offense level pursuant to U.S.S.G. § 3A1.1. This section of the Sentencing Guidelines requires district courts to upwardly adjust offense levels by two levels "[i]f the defendant knew or should have known that a victim of the offense was

unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1. Dr. Singh maintains that the evidence failed to show that he selected his victims because of their vulnerability. Although we take no position on whether the adjustment ultimately may be appropriate in this case, we agree with Dr. Singh that the district court's findings are insufficient to determine whether he targeted his victims. We therefore remand to the district court for additional fact finding and resentencing.

■■■■■ The application notes to § 3A1.1 make clear that "[t]his adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant. The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim." U.S.S.G. § 3A1.1, comment. (n.1). To apply this provision, the district court must make two findings. First, the court must find that the victim was unusually vulnerable. In *United States v. Wilson*, 913 F.2d 136, 138 (4th Cir.1990), we quoted with approval the Fifth Circuit's formulation that " '[t]he vulnerability that triggers § 3A1.1 must be an "unusual" vulnerability which is present in only some victims of that type of crime.' " *Id.* (quoting *United States v. Moree*, 897 F.2d 1329, 1335 (5th Cir.1990)). In other words, because of age, mental or physical condition, or any other

relevant deficit, in a proper § 3A1.1 enhancement the victim must be more susceptible to abuse from a perpetrator than most other potential victims of the particular offense.[4]

■■■ Second, the district court must find that the defendant "targeted" the victim because of the victim's unusual vulnerability. The application notes caution that the adjustment "would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." U.S.S.G. § 3A1.1, comment. (n.1). Recently, we indicated that § 3A1.1 does not apply where the defendant did not initially target the victim because of her vulnerability, but rather began to take advantage of the victim's vulnerability only midway through the crime. *United States v. Gary*, 18 F.3d 1123, 1128–29 (4th Cir.) (indicating that defendant who created mental instability in victim could not have his sentence increased under § 3A1.1 because this would amount to impermissible double counting as the defendant already received an enhancement due to extreme psychological injury), *cert. denied*, —— U.S. ——, 115 S.Ct. 134, 130 L.Ed.2d 77 (1994). We noted in *Gary:* "Most courts agree ... that the defendant must have initially *chosen* his victim because of her particular vulnerability. The enhancement relates to the conduct of the defendant...." *Id.* (emphasis added). At the very least, the victim's vulnerability must play a role in the defendant's decision to select that victim as the target of the crime.[5]

---

4. *See United States v. Bengali*, 11 F.3d 1207, 1212 (4th Cir.1993) (finding that recent immigrant was susceptible to extortionist's criminal plot due to his naivete about American customs), *cert. denied*, —— U.S. ——, 114 S.Ct. 1853, 128 L.Ed.2d 477 (1994); *United States v. Lallemand*, 989 F.2d 936, 939–40 (7th Cir.1993) (finding that married homosexuals may be a "particularly susceptible subgroup of blackmail victims"); *United States v. Hershkowitz*, 968 F.2d 1503, 1505–06 (2nd Cir.1992) (finding that a detainee attacked by a detention officer in prison was an unusually vulnerable victim in relation to his superiors; *United States v. Peters*, 962 F.2d 1410, 1418 (9th Cir.1992) (concluding that people with bad credit were unusually vulnerable victims to the perpetrators of a credit card fraud scheme); *Wilson*, 913 F.2d at 138 (holding that the entire city of Raleigh, North Carolina, could not be "vulnerable victims" of a fraudulent tornado relief mail

fraud scheme solely because Raleigh had recently suffered a devastating tornado).

5. *See also, United States v. Lee* , 973 F.2d 832, 834 (10th Cir.1992) (finding "that there should be a nexus between the victim's vulnerability and the" successful commission of the offense); *United States v. Sutherland*, 955 F.2d 25, 28 (7th Cir.1992) (reversing upward adjustment because there was no evidence that defendant targeted the elderly due to their vulnerability); *United States v. Depew*, 932 F.2d 324, 330 (4th Cir.) (finding that the adjustment was properly applied where defendant intended to target a twelve year old boy for involvement in a child pornography film), *cert. denied*, 502 U.S. 873, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991); *United States v. Cree*, 915 F.2d 352, 354 (8th Cir.1990) (reversing the § 3A1.1 adjustment when there was no evidence that the defendant knew of the victim's alcohol-

Therefore, the district court must first look to the victim to determine whether this particular victim was more vulnerable to the offense than the world of possible victims. Then, the court must determine whether the defendant specifically targeted the victim because of that vulnerability. If both of these conditions are satisfied, then the base offense level should be increased two levels under § 3A1.1.[6] *See, e.g., United States v. Paige,* 923 F.2d 112, 113–14 (8th Cir.1991) (reversing an upward adjustment even though the defendant targeted stores with young clerks to pass fraudulent money orders, because there was no evidence showing that the young clerks were unusually vulnerable).

The Government asserts two grounds to support the adjustment: (1) the district court's ruling from the bench and (2) its adoption of the Government's arguments in favor of the application of § 3A1.1. We do not believe that these two sources sufficiently reflect "the extra measure of criminal depravity which § 3A1.1 intends to more severely punish." *Moree,* 897 F.2d at 1335.

 We first look to the district court's ruling from the bench. At the sentencing hearing, the district court's sole exposition on § 3A1.1 went as follows:

> The Court finds under the circumstances that Dr. Singh knew of the physical and mental condition of some of these victims which made them particularly susceptible to the conduct involved. Accordingly, the Court will enhance by two levels in that regard.

(J.A. 856.) This generalized finding does not support a § 3A1.1 adjustment. The court did not explain how Dr. Singh chose any particular patient because of a vulnerability. Nor did it explain the "physical and mental condition[s]" of Dr. Singh's patients that rendered them unusually vulnerable. As a result, we cannot say from the district court's bench ruling whether it correctly determined that a § 3A1.1 adjustment was warranted.

Next, we would normally look to the justifications offered in the presentence report. A district court may adopt the findings in a presentence report in order to sustain a particular sentencing decision. *See United States v. Walker,* 29 F.3d 908, 911 (4th Cir. 1994). Here, however, the presentence report "strongly considered" the adjustment and decided "that the enhancement should not apply." (J.A. 885.) Expressing some of the same concerns that we have today, the probation officer preparing the presentence report rejected the adjustment because no evidence demonstrated that Dr. Singh "actively solicit[ed] the sale of controlled substances or [sought] out any individual as a target." (J.A. 885–86.)

 Instead, we review here whether the Government's objections to the presentence report can sustain the adjustment. Certainly, when a district court adopts the government's objections to a presentence report and the government's objections clearly expound specific facts supporting the correct application of the Guidelines, we would affirm. Here, however, the Government's objections were no more specific or helpful than the district court's ruling from the bench in establishing that Dr. Singh targeted his victims.

 The Government had petitioned the district court to apply the enhancement for the following reasons:

> [T]he United States contends that Dr. Singh was prescribing controlled substances with a high abuse and addiction potential to known drug abusers. The drug abusers testified that the only reason they went to Dr. Singh was because they know [sic] he would write them a prescription for their drug of choice. Many of these patients were on Medicaid and were "locked-in" to seeing Dr. Singh.

(J.A. 884.) The factual conclusions adopted by the district court fail to show *that Dr. Singh selected a particular victim to exploit*

---

related vulnerability or that defendant attacked the victim because of the vulnerability).

**6.** *See also, United States v. Smith,* 39 F.3d 119, 124 (6th Cir.1994) ("[I]n order to enhance a defendant's base offense level under U.S.S.G.

§ 3A1.1, the evidence must show that the defendant knew his victim was unusually vulnerable and that he perpetrated a crime on [the victim] because he was vulnerable.").

that person's drug addiction. As we stated in *Gary,* "[t]his court ... has recognized that the vulnerable victim enhancement is meant to punish an extra measure of criminal depravity in the *selection* of the victim." 18 F.3d at 1128 (emphasis added). None of the Government's factual assertions—that Dr. Singh knowingly prescribed drugs to known drug abusers, that the abusers went to Dr. Singh because they knew he would write the prescription they wanted, or that Medicaid forced patients to choose a single health care provider and these patients chose Dr. Singh—show that Dr. Singh selected any of his victims *because* they were vulnerable drug abusers; *because* they were good customers; or *because* they were forced to use Dr. Singh's services. The causal nexus between the defendant's choice of victim and the victim's vulnerability is missing. Without evidence that Dr. Singh targeted the victims because of their vulnerability, we are unable to affirm the adjustment application.

In further support of the enhancement, the Government argued:

> Rather than refusing to prescribe the drugs or decrease the dosages, Dr. Singh continued to prescribe drugs thereby furthering addiction to the drugs.
> The evidence at trial showed that Dr. Singh exhibited an utter lack of concern for his patients. This was exhibited by his failure to properly examine, treat and mon-

itor those patients. Such conduct establishes a willful blindness to his patient's medical problems and need. Based on his conduct towards his patients, the base offense level should be increased by two levels.

(J.A. 884.) None of these facts show that Dr. Singh targeted extremely vulnerable victims. This evidence only supports the conclusion that Dr. Singh abused the unique relationship between a doctor and his patient. U.S.S.G. § 3B1.3 already accounts for this abuse, and Dr. Singh appropriately received an adjustment pursuant to that provision.[7]

Even considering that the district court adopted the Government's justification for the adjustment, nothing demonstrates that Dr. Singh specifically targeted any victim because of a particular vulnerability. "In our opinion, the court's conclusory statements ... do not allow us meaningfully to review the court's" application of § 3A1.1. *United States v. Rusher,* 966 F.2d 868, 883 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). Without an articulation of evidence supporting the requirements to upwardly adjust Dr. Singh's sentence, we cannot affirm. The district court must make factual findings sufficient to show not only that the victims were more vulnerable than the average victim of a physician who distributes narcotics illegally,[8] but also that Dr.

---

7. Finally, we must note that the district court cannot apply a § 3A1.1 enhancement simply because the victims were Dr. Singh's patients. To do so would be improper for two reasons. First, it would suggest a *per se* rule that the enhancement is applicable whenever a doctor violates § 841(a)(1) by distributing drugs to his patients. All patients are vulnerable to their treating physician to a certain extent, yet, § 3A1.1 intends to punish a criminal who targets victims that are especially susceptible to the perpetrator's criminal design. Under § 3A1.1, when a doctor abuses his position to perpetrate a crime upon his patient, the victim-patient must be more vulnerable to the crime than the average patient whom the doctor could target for criminal activity. Second, to the extent that this application would hold that the element of trust inherent in the doctor/patient relationship itself made the patients vulnerable victims, at least in Dr. Singh's case, it would constitute impermissible double counting. "Impermissible double counting occurs when a district court imposes two or more upward adjustments within the guidelines range, when both are premised on the *same* conduct."

*United States v. Haines,* 32 F.3d 290, 293 (7th Cir.1994) (emphasis in original). In *Haines,* for instance, the Seventh Circuit affirmed a district court's imposition of both § 3A1.1 and § 3B1.3 adjustments because there was evidence to support each enhancement individually. *Id.* at 293–94. Because Dr. Singh already had a two point adjustment for abusing a position of trust under § 3B1.3, a court could not also hold that his patients were vulnerable solely because he was in a position to violate their trust. *See also Gary,* 18 F.3d at 1129 (noting that the victim's "weakened state is appropriate evidence for the application of a[n upward] departure for extreme psychological injury; using [the victim's weakened state] as evidence of Gary's selection of a vulnerable victim amounts to double counting").

8. In doing so, the district court should look to the nature of each patient's addiction, its severity, whether the drug prescribed by the doctor would contribute to or exacerbate that addiction, the availability of the addictive substance, and other similar factors that would distinguish these

Singh selected these particular victims to be the target of his crime because of that vulnerability. Therefore, we remand to the district court for additional fact-finding and, if necessary, resentencing on the issue of § 3A1.1. *Cf. United States v. Pelkey*, 29 F.3d 11, 16 (1st Cir.1994) (remanding for resentencing under U.S.S.G. § 5K2.3 when district court's factual conclusions did not support its departure for psychological harm); *Rusher*, 966 F.2d at 883–85 (remanding for resentencing when the district court did not explain its reasons for upwardly departing from the recommended criminal history category pursuant to U.S.S.G. § 4A1.3).

### B.

Finally, Dr. Singh argues that we should reverse long-standing precedent and hold that sentences under U.S.S.G. § 2D1.1 should be calculated based on the active weight of the controlled substances rather than the gross weight of the substance and its carrier. Although Dr. Singh strenuously attempts to persuade us otherwise, we are bound by unequivocal circuit precedent. In *United States v. Daly*, 883 F.2d 313, 315–18 (4th Cir.1989), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990), we decided that both the plain text of the Guidelines and the plain language of the underlying congressional act instructed sentencing courts to apply the gross weight theory in sentencing. Then, in *United States v. Meitinger*, 901 F.2d 27, 29 (4th Cir.), *cert. denied*, 498 U.S. 985, 111 S.Ct. 519, 112 L.Ed.2d 531 (1990), we applied this theory to defendants, like Dr. Singh, convicted of illegally distributing controlled pharmaceutical substances. These precedents were soundly decided, and we will not consider Dr. Singh's invitation to reexamine them.

### IV.

For the foregoing reasons, we affirm Dr. Singh's conviction, the district court's failure to give the jury an entrapment instruction, and its denial of Dr. Singh's motion for a new trial. We also reject Dr. Singh's challenge to

victims from other victims of this crime. These are fact-specific determinations that the district

our interpretation of U.S.S.G. § 2D1.1. We agree, however, that the district court failed to adduce enough evidence to apply U.S.S.G. § 3A1.1 and remand for resentencing on that issue. We therefore affirm in part, reverse in part, and remand for resentencing.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.*

court must evaluate on an individual basis.