UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-5028
(2:09-cr-00017-jpj-pms-1)

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

JOHN JOEL FOSTER, a/k/a Jack Foster,

Defendant - Appellee.

O R D E R

The Court amends the opinion of Davis, Circuit Judge, dissenting from the order denying rehearing en banc filed March 6, 2012, as follows:

On page 14, second paragraph of text, line 7 -- "Appellant Foster" is corrected to read "Appellee Foster."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

Filed: March 6, 2012

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JOHN JOEL FOSTER, a/k/a Jack
Foster,

*Defendant-Appellee.*

No. 10-5028

## ORDER

Appellee has filed a petition for rehearing en banc. The government filed a response in opposition to the petition.

A member of the court requested a poll on the petition for rehearing en banc. Judge Motz, Judge King, Judge Gregory, Judge Davis, Judge Keenan, Judge Wynn, and Judge Floyd voted to grant rehearing en banc. Chief Judge Traxler, Judge Wilkinson, Judge Niemeyer, Judge Shedd, Judge Duncan, Judge Agee, and Judge Diaz voted to deny rehearing en banc.

Because the poll on rehearing en banc failed to produce a majority of judges in active service in favor of rehearing en banc, the petition for rehearing en banc is denied. Judge Wilkinson filed an opinion concurring in the denial of rehearing en banc. Judge Motz filed an opinion dissenting from the denial of rehearing en banc, in which Judge King, Judge Gregory, Judge Davis, Judge Keenan and Judge Floyd joined. Judge Davis filed an opinion dissenting from the denial of

rehearing en banc, in which Judge Gregory joined. Judge Wynn filed an opinion dissenting from the denial of rehearing en banc, in which Judge Gregory and Judge Davis joined.

Entered at the direction of Judge Agee for the court.

For the Court

/s/ Patricia S. Connor, Clerk

WILKINSON, Circuit Judge, concurring in the denial of rehearing en banc:

I concur in the denial of rehearing en banc. Judge Agee has written a persuasive opinion for the court, and I add only these few thoughts in response to my dissenting friends and colleagues. I appreciate the sincerity of the dissenters' convictions, and I believe the vigorous discussion of our differences to be a mark of mutual respect.

This is hardly an atypical ACCA case. Foster's instant offense of conviction was being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He had previously been convicted three times for breaking and entering in violation of Va. Code § 18.2-90 (1992) (amended 2004).

As the panel majority explained, the question presented here is whether Foster's prior convictions for breaking and entering the "Corner Market" and "Sunrise-Sunset Restaurant" satisfy the generic definition of burglary and can thus serve as predicate offenses under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1). The Virginia statute can be violated in a variety of ways, including both burglary of an "office, shop, manufactured home, storehouse, ware-

house, banking house, church as defined in § 18.2-127, or other house," which would qualify as generic burglary, and breaking and entering a "ship, vessel or river craft or any railroad car," which would not. Va. Code § 18.2-90.

State indictments are not structured with an eye to the ACCA, and had the charging documents here quoted the Virginia law, they still would not have used the magic words "building or structure" that would alone seem sufficient to satisfy the dissenters. One could say that of course the enumerated list of "office, shop, manufactured home, storehouse, warehouse, banking house, [or] church" refers to buildings or structures. But then it seems equally obvious that "Market" or "Restaurant" would as well, particularly since the Virginia law's listing is not exclusive, including as it does any "other house" as a qualifying building.

The panel majority carefully explained why burglary of the "Corner Market" and "Sunrise-Sunset Restaurant" must surely qualify as "unlawful or unprivileged entry into, or remaining in, a building or structure," *Taylor v. United States*, 495 U.S. 575, 599 (1990), within the ambit of the ACCA. The dissenters disagree, however, concluding that breaking and entering the "Corner Market" or "Sunrise-Sunset Restaurant" might not satisfy *Taylor* because one of those establishments could in fact be something other than a building or structure, namely a non-generic "ship, vessel, or river craft or any railroad car," Va. Code. § 18.2-90.

In urging this unlikely possibility, the dissenters here charge the majority with grossly failing to abide by *Shepard v. United States*, 544 U.S. 13 (2005). But the dissenters have missed the whole point of what the debate in *Shepard* was about. The *Shepard* Court held that the modified categorical inquiry under the ACCA could only be answered by reference to "the charging document, the terms of a plea agreement or transcript of colloquy, . . . or to some comparable judicial

record," *id.* at 26, and that a sentencing court may not "look to police reports or complaint applications," *id.* at 16.

The Court did not opine on the relative validity of a street address as proof of burglary of a building with anything near the specificity that the dissenters in this case suggest. The Supreme Court majority never discusses the facts that Judge Motz here presses, and the *Shepard* dissenters refer to them so briefly that only the most careful reader would catch the mention. The *Shepard* Court had other much bigger fish to fry, focusing its efforts solely on the question of the use of non-authoritative documents to satisfy the demanding ACCA inquiry. My esteemed colleague Judge Motz spends time speculating and hypothesizing why the *Shepard* Court decided what it did, but the fact remains that the Court decided what it did in fact decide. There was no discussion whatsoever of the point on which my dissenting friend now relies. No court has doubted what the decision stood for — it is where we get the term "*Shepard*-approved documents" in the first place. And the panel majority here committed no *Shepard* error. It relied only on the charging documents that spelled out what places Foster has burglarized. It consulted no police reports, complaint applications, or other documents whose use *Shepard* both addressed and foreclosed.\*

---

\*Even if one were to take the dissent's view of *Shepard* as its guide, the conclusion the dissent urges does not follow. The dissent argues that the Supreme Court has commanded that a street address, and by analogy a descriptive business name, is insufficient evidence of a generic burglary. But the facts of *Shepard* do not support so broad an inference. To take one example from *Shepard*, the complaint form includes a street address, 30 Harlem St., in a box labeled "Place of Offense," Joint App'x, Vol. III, at 5, *Shepard*, 544 U.S. 13 (2005), 2004 WL 2289702, but then unhelpfully continues to describe the offense as "break[ing] and enter[ing] in the night time the building, ship, vessel, or vehicle, the property of Jerri Cochran," *id.* That complaint form is different from a complaint detailing the street address as the burgled home or residence itself. A street address listed as the "Place of Offense" is less than enlightening as to the nature of what was burgled. Certainly, one would imagine that in a complaint for bur-

That then leaves the dissenters in a difficult position. Unable to accuse the majority that it committed the *Shepard* error of consulting non-conclusive judicial documents, the dissenters are reduced to claiming that the majority must somehow have resorted to extrinsic evidence. By doing so, the dissenters contend that the majority has diminished the role of the district court and engaged in impermissible appellate fact finding.

Just like its earlier claim of inconsistency with *Shepard*, this accusation of impermissible appellate fact finding runs acropper. To begin with, classic trial court fact finding involves a selection of a likely or correct choice between two or more factual possibilities. In the land of Oz, I suppose there may be two or more ways to interpret the clear facts set forth in the *Shepard*-approved documents. On this side of the rainbow, however, the Corner Market and Sunrise-Sunset Restaurant are buildings and structures.

Fact finding also by its very name implies that a fact must be "found." Here, there is no need to "find" anything. The fact has sought us out. It has relieved the need for findings because the names themselves announce the nature of the establishments, which are buildings and structures. A large and lamentable silence pervades all of the dissenting opinions. They are quick to heap opprobrium on the exercise of the obvious, but slow to suggest what the Corner Market and Sunrise-Sunset Restaurant might be other than buildings or structures.

---

glary of a vehicle, the "Place of Offense" listed might be the nearest street address, and so the geographic identifier does not illuminate which of the four possible types of breaking and entering occurred at that particular location. In the case at bar, by contrast, there is no dispute that Foster broke and entered the establishments named the Corner Market and the Sunrise-Sunset Restaurant. It seems clear enough that the specific naming of the premises where Foster's crimes took place is a stronger factual basis for the application of the ACCA than the mere identification of a street address as the "Place of Offense."

Further, the classic indicia of trial court fact finding are absent. While my fine colleagues are correct to note the considerable deference accorded trial courts in the fact finding process, the things we normally associate with that process—and the superior vantage point the process affords district courts—are absent here. The trial court heard no witnesses and made no credibility findings. It examined no physical or forensic evidence. It engaged in no trial management function. Instead, the trial and appellate courts are on a parity and had before them the same judicially approved charging statements.

This sort of parity does not entitle us to discount the value of a trial judge's sound opinion. *See United States v. Taylor*, 659 F.3d 339, 347-48 (4th Cir. 2011) (upholding a trial judge's determination or "finding" from a plea colloquy that a dangerous assault was indeed a crime of violence as defined by the ACCA). But the parity before us ordinarily suggests something more akin to *de novo* review. In such an instance, it hardly seems proper to chide the majority for using common sense akin almost to judicial notice. Even appellate judges are endowed with brains in the hope and expectation that they will be used to obvious purpose. We could of course fantasize that somewhere in the craggy highlands of Lee County there exists a floating barge by the name of Corner Market or a railroad car sweetly dubbed the Sunrise-Sunset Restaurant. But neither the Supreme Court nor Congress would either require or indeed approve of such a step.

In fact, the Court has not been afraid to inject an element of practicality in the ACCA when such has been required. This past June, the Court in *Sykes v. United States*, 131 S. Ct. 2267 (2011), upheld the application of the ACCA based on what it frankly described as "the commonsense conclusion that Indiana's vehicular flight crime is a violent felony." *Id.* at 2274. The dissent argues that comparing the *Shepard* inquiry and the "risk of physical injury" inquiry is like mixing apples and oranges, suggesting that the Supreme Court is

somehow jumping to and fro within the same statute on the basic question of whether its provisions merit even a modicum of common sense in application.

But *Sykes* is only the most recent example of what has become a virtually annual ritual of the Supreme Court deciding all manner of ACCA cases through resort to plain, reasonable logic. In *Johnson v. United States*, 130 S. Ct. 1265 (2010), the Court found that the ACCA's terms should be interpreted according to their "ordinary meaning" and not be subject to a crabbed "specialized legal usage" that would vitiate Congress's intent. *Id.* at 1270. A year prior, the Court in *Chambers v. United States*, 555 U.S. 122 (2009), did not rely on the sort of beyond-a-shadow-of-a-doubt certainty that the dissenters seem to think the ACCA demands, but instead premised its holding on the probabilistic logic that "the behavior that likely underlies a failure to report would seem less likely to involve a risk of physical harm" than escape from custody. *Id.* at 127. The groundwork for that decision was laid in *Begay v. United States*, 553 U.S. 137 (2008), which found that ACCA questions should be resolved based on what the crimes at issue "typically involve." *Id.* at 144. And perhaps most damning, the Court in *James v. United States*, 550 U.S. 192 (2007), was clear that the "ACCA does not require metaphysical certainty." *Id.* at 207. While the dissenters might be able to "hypothesize unusual cases," *id.* at 208, in which the Corner Market, instead of being on the proverbial corner, is instead on a "small river craft," such conjecture is not only fanciful, but it is at odds with the simple common sense on which the Supreme Court has relied in ACCA cases for five straight years and counting.

I recognize that interpreting the ACCA is not always easily accomplished, and I sympathize with the many jurists who have rightly pointed out its imprecise phraseology and interpretive difficulty. But such challenges come with the territory, and we lack the authority to declare war on statutes we may find distasteful. The dissenters decry the result here as

"tragic." *See post* at 13 (Motz, J.). I certainly respect their right to hold this view, but it has no bearing on the legal question before us. Theirs is a policy disagreement with the ACCA to be taken up with Congress. If Congress wishes to permit felons to carry certain firearms or to disqualify certain predicate offenses after the passage of time, it can surely do so, but it has created no such exemptions applicable to this case. Congress had a legitimate purpose in mind when it sought to protect the public from violent acts committed by those with a violent criminal history. The statute has an awkward name and the means chosen to pursue its purpose have assuredly created headaches for this fine court and others, but that does not confer on us a warrant—constitutional or otherwise—to eviscerate its aims and displace with our own will the democratic legitimacy accorded by our founding document to others.

There are worse fates for a judicial decision than to have it align with the practical virtues of logic and common sense. The term "objective reasonableness" is much in vogue these days, and properly so. *See, e.g.*, *Davis v. United States*, 131 S. Ct. 2419 (2011) (holding that a need "to prevent Fourth Amendment law from becoming ossified," *id.* at 2433, cannot overcome objectively reasonable reliance on the law in force at the time of a search). Objective reasonableness presupposes that courts do not allow the occasional medieval tendencies present in all professions to separate us so thoroughly from good logic that our decisions drive citizens to rubbing their eyes and scratching their heads. If one were to inquire of an objectively reasonable person on the street whether something named the Sunrise-Sunset Restaurant was a building or structure as opposed to a river craft or railroad car, the response would be "Of course. Why do you ask?" We ask because the generic approach of modified categorical analysis requires us to, and the Supreme Court has commended to us common sense in answering. That is precisely what the panel majority has done, and it is why I am pleased to concur in the denial of the petition for rehearing en banc.

DIANA GRIBBON MOTZ, Circuit Judge, dissenting from the denial of rehearing en banc:

With respect, I dissent from my colleagues' refusal (7-7) to grant rehearing en banc in this case. Judge Wynn's excellent dissent from the panel opinion well explains why we should have affirmed the judgment of the district court. *See United States v. Foster*, 662 F.3d 291, 298 (4th Cir. 2011). I write now only to point out that the panel opinion is directly and inexplicably at odds with what all recognize is controlling law —*Shepard v. United States*, 544 U.S. 13 (2005).

In *Shepard*, the Court grappled with the very question at issue here—whether a defendant's state burglary convictions necessarily involved entry into *buildings*, and thus qualified as ACCA predicate offenses. *Id.* at 17. *Shepard* held that only certain "conclusive records made or used in adjudicating guilt"—now widely known as *Shepard*-approved documents —can establish with the requisite certainty that the state predicate convictions "'necessarily' rested on the fact" that the defendant burglarized a building, and thus committed the ACCA predicate offense of generic burglary. *Id.* at 21.

In *Shepard* itself, the *Shepard*-approved documents set forth the actual street addresses, *e.g.*, "30 Harlem St.," of the burglarized establishments. *Id.* at 31-32 (O'Connor, J., dissenting). Yet both the Government and the *Shepard* Court (majority and dissent) agreed that the actual street addresses were *insufficient* to demonstrate that the defendant had burglarized *buildings*.[1]

---

[1]The Government acknowledged this at oral argument, *see* 544 U.S. at 21 (quoting Brief for United States at 25), and the *Shepard* dissenters agreed with the majority on this point. *Id.* at 31 (O'Connor, J., dissenting) ("If these complaints [containing the addresses] were the only evidence of the factual basis of Shepard's guilty pleas, then I would agree with the majority that there was no way to know whether those convictions were for burglarizing a building.").

The panel in the case at hand, nonetheless, concludes that the mere proper names of burglarized establishments are *sufficient* to prove that the defendant burglarized *buildings*. The panel puts forward no reason, and I can discern none, why the proper names of burglarized places in this case establishes that they are buildings while the actual street addresses of burglarized places in *Shepard* did not.

The panel's error stems from its understandable urge to avoid an unlikely conclusion by applying "common sense" or "logic." *See Foster*, 662 F.3d at 291-98 (panel majority and concurrence invoking "common sense" no less than fifteen times, and "logic" six times). The First Circuit had precisely the same understandable inclination in *Shepard*. *See Shepard*, 348 F.3d 308, 314 (1st Cir. 2003), *rev'd* 544 U.S. 13 (2005). Just as the First Circuit concluded that the offenses qualified as ACCA predicates because it was "unlikely—to the point of nearly impossible" that the burglaries were not of buildings, *id.*, the panel here concludes that the Government has met its burden of establishing the burglaries were of buildings because there is only a "more-than-remote possibility" that they were not, *Foster*, 662 F.3d at 295. But in reversing the First Circuit in *Shepard*, the Supreme Court prohibited ACCA courts from fact-finding by "common sense," "logic," or the law of probabilities. Rather, *Shepard* requires ACCA courts to limit their role to determining whether a small group of reliable documents prove beyond question that the prior offense constitutes a proper ACCA predicate.

Specifically, *Shepard* holds that *only* "conclusive records made or used" *by the original sentencing court* can provide the reliability needed to determine that the prior state convictions "*necessarily*" (not very, very likely) qualified as proper ACCA predicates. 544 U.S. at 21 (emphasis added). In reaching this holding, no member of the *Shepard* Court suggested that common sense or logic or probabilities (or judicial notice) could establish that buildings stood at the burglarized addresses. Indeed, even the Government disavowed the view

that a court could consult extrinsic evidence. *See* Transcript of Oral Argument, *Shepard*, 544 U.S. 13, at 27-28.

Moreover, the *Shepard* Court clearly understood that its holding would sometimes require courts to turn a blind eye to common sense and logic. Both the majority and the dissent recognized the overwhelming likelihood that the predicate burglaries in that case involved buildings, not boats. *See, e.g.*, 544 U.S. at 22, 24 n.4; *id.* at 29 (O'Connor, J., dissenting); Transcript of Oral Argument at 5 ("[T]here isn't any question . . . that the police reports in fact gave addresses of particular buildings.") (Ginsburg, J.); *id.* at 8-9 ("There are no boats, you know, in Watertown. It's not a dock . . . .") (Breyer, J.); *id.* at 24 ("This is a case where we all know what the truth is . . . .") (Kennedy, J.). Nevertheless, the Court required that proof that the burglarized entities were buildings come from a small group of reliable documents that "necessarily" established this fact.

*Shepard* set forth a bright-line rule that prohibits courts from "mak[ing] a disputed finding of fact about what the defendant and state judge must have understood as the factual basis of the prior plea." 544 U.S. at 25. Instead, *Shepard* requires that *Shepard*-approved documents *alone* conclusively establish that the state offense "'necessarily' rested on the fact[s]" qualifying it as an ACCA predicate. *Id.* at 21. Even though the Court has recently recognized that the "absence of records will often frustrate application of the [ACCA]," *Johnson v. United States*, 130 S. Ct. 1265, 1273 (2010), it has resisted efforts to back away from *Shepard*'s bright-line rule. *See, e.g.*, *United States v. Gutierrez-Ramirez*, 405 F.3d 352 (5th Cir.), *cert. denied* 546 U.S. 888 (2005) (forbidding use of abstracts of judgment).

Understandably judges will be tempted to rely on "common sense" or "logic," for these are normal fact-finding tools. But *Shepard* outlaws their use when determining if a prior conviction "necessarily" rests on facts qualifying it as an ACCA

predicate. 544 U.S. at 21. It does so because of the "practical difficulties" of non-contemporaneous fact-finding, *id.* at 20, and to avoid the potential erosion of the "*Jones-Apprendi* implementation of the jury right," *id.* at 24-25 (Souter, J.).**²** By resorting to "common sense" and "logic" the panel engages in precisely the sort of fact-finding that *Shepard* forbids.

In response to these thoughts, the concurrence contends that I have "missed the whole point of what the debate in *Shepard* was about." According to the concurrence, the *Shepard* Court had "much bigger fish to fry" than "opin[ing] on the relative validity of a street address as proof of a burglary of a building." What the concurrence steadfastly ignores, however, is that only because all involved (Shepard, the Government, and the Supreme Court majority and dissent) agreed that the actual street addresses of burglarized establishments did *not* prove that they were buildings did the Court need to "fry" the "bigger fish," *i.e.*, resolve whether police reports or complaint applications could be considered in determining if the burglary was of a building and so a proper ACCA predicate. I suppose the *Shepard* Court could have opined on this "big fish" question even if it believed that street addresses sufficed to establish that a building had been burglarized. But that would make the entire *Shepard* opinion dicta. No court has suggested this. Rather, until today, courts have uniformly regarded the bright-line rule established in *Shepard* as the Court's holding and consistently followed that holding.**³**

---

**²**Though Justice Souter's Sixth Amendment discussion only garnered a four Justice plurality, Justice Thomas, the fifth vote, took an even stronger view of the need for constitutional protection and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Thus Justice Thomas went further than the majority, arguing that "the [judicial] factfinding procedure the [majority] rejects gives rise to constitutional error, not doubt." 544 U.S. at 28 (Thomas, J., concurring in part and concurring in the judgment). Moreover, Justice Thomas argued that even the "limited factfinding" approved of by the majority and by *Taylor v. United States*, 495 U.S. 575 (1990), also ran afoul of *Apprendi*.

**³**Alternatively, the concurrence presses an even less persuasive challenge to *Shepard*'s unequivocal holding. The concurrence suggests that for

In short, I believe the panel has failed to abide by *Shepard*. The *Shepard*-approved documents in this case, which set forth only the proper (not generic) names of the places burglarized, are even less adequate to prove those places are buildings than the documents held inadequate in *Shepard*, which contained the actual street addresses of the places burglarized. The panel's resort to "common sense" and "logic" constitutes the sort of fact-finding held impermissible in *Shepard*.

The panel's errors have serious real life consequences for the defendant, John Joel Foster. These errors result in treatment of Foster's possession of a firearm (a hunting rifle in his truck) as the crime of an armed career criminal. Thus these errors subject Foster to imprisonment for fifteen, rather than two and a half, years. This seems a particularly tragic result given that after committing the disputed state burglaries at nineteen, Foster remained conviction-free for almost two decades. If common sense and logic had any role here, surely they would suggest that this is not the record of an armed career criminal.

I must dissent. Judge King, Judge Gregory, Judge Davis, Judge Keenan, and Judge Floyd have authorized me to indicate that they join in this dissent.

---

"five straight years and counting" the Court has retreated from *Shepard*'s bright-line rule and endorsed fact-finding by "practicality," "plain[ ] reasonable logic," "probabilistic logic," and "common sense." This mixes apples and oranges. The cases on which the concurrence relies dealt with an "inherently probabilistic" inquiry, *James v. United States*, 550 U.S. 192, 207 (2007), *i.e.*, whether prior offenses "involve[d] conduct that presents a *serious potential risk* of physical injury to another." *See* 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added). This "probabilistic" inquiry is far removed from the *Shepard* inquiry, which asks only whether a prior conviction "'necessarily' rested on the fact[s]" qualifying it as an ACCA predicate. *Shepard*, 544 U.S. at 21.

DAVIS, Circuit Judge, dissenting from the denial of rehearing en banc:

Injustice comes in many forms. It is insidious. It chokes persons and their communities alike. It besmirches legislators, prosecutors, and yes, judges, alike. It undermines public confidence in government and its institutions. It mocks our national commitment to the ideal of evenhandedness and fairness. And, when it is the product of an unwarranted and inexplicable deviation from settled standards, it holds hands with iniquity.

I am persuaded that this case presents a profound exemplar of injustice, and I deeply regret the court's refusal to rehear this case en banc. I am honored to join in the elegant dissenting opinion of my good colleague, Judge Motz. Judge Motz conclusively demonstrates that the panel majority in this case has deviated from Supreme Court precedent and thereby inflicted a grievous harm on Appellee Foster and, frankly, on the rule of law. I offer this additional critique of the panel majority's handiwork as further illustration of how injustice so infects the outcome of this proceeding.

I.

First, as Judge Wynn's panel dissent forcefully argued, the panel majority has seriously misapplied the appropriate standard of review. The majority opinion states: "We consider de novo whether an offense qualifies as a violent felony under the ACCA. *United States v. Thompson*, 421 F.3d 278, 280–81 (4th Cir. 2005)." *United States v. Foster*, 662 F.3d 291, 293 (4th Cir. 2011). But this is, at best, an incomplete statement of the controlling legal principles. Indeed, *Thompson* itself states: "We review *legal determinations* of the district court de novo. *United States v. Blake*, 81 F.3d 498, 503 (4th Cir. 1996)." 421 F.3d at 280-81 (emphasis added). *Blake*, in turn, states: "We begin by noting that in reviewing the application of the guidelines by a district court, we examine factual deter-

minations for clear error; legal questions, however, are subject to a de novo standard of review. *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995)." 81 F.3d at 503.

*Singh*, on which *Blake* relied, made clear the mixed standard of review:

> Applying the statutory command to give "due deference" to a district court's application of the sentencing guidelines, we review factual determinations for clear error and legal questions *de novo*. *United States v. Daughtrey*, 874 F.2d 213, 217-18 (4th Cir. 1989).

54 F.3d at 1190. And in *Daughtrey*, the court provided a full exposition of the standard of review of sentencing determinations made after the Sentencing Reform Act of 1984, while summarizing the bottom-line notion as follows: "If the issue turns primarily on a factual determination, an appellate court should apply the 'clearly erroneous' standard." 874 F.2d at 217.

This illustration of the lineage of our proper standard of review is unassailable. Indeed, Judge Agee makes that clear in his recently-published opinion in *United States v. Moore*, 666 F.3d 313, __, No. 10-4474, slip op. at 12 (4th Cir. Jan. 25, 2012) ("In the context of sentencing, we review the district court's legal determinations *de novo*, and its factual findings for clear error. *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008).").[1]

---

[1] *See also United States v. Washington*, 629 F.3d 403, 411 (4th Cir.) (Wilkinson, J.) ("We review legal issues such as whether a defendant's previous conviction counted as an ACCA predicate de novo, and we review factual findings for clear error.") (citations omitted), *cert. denied*, 132 S. Ct. 127 (2011); *United States v. Abu Ali*, 528 F.3d 210, 261 (4th Cir. 2008) (Traxler, J.) ("As always, when considering a sentence's reasonableness, we 'review the district court's legal conclusions *de novo* and its factual findings for clear error.'"); *United States v. Thornton*, 554 F.3d 443, 445 (4th Cir. 2009) (Duncan, J.) ("When considering a sentence's reasonableness, we 'review the district court's legal conclusions *de novo* and its factual findings for clear error.'").

Before the panel in this case, the government did not suggest anything to the contrary, although it cleverly sought to obfuscate the standard of review with this description of the applicable standard of review in its brief: "Whether an offense qualifies as a 'violent felony' under the Armed Career Criminal Act is *ultimately* a matter of law that is reviewed *de novo*. *United States v. Thompson*, 421 F.3d 278, 280-281 (4th Cir. 2005)." Appellant's Br. at 6 (emphasis added). Of course, the "ultimate" question under any statute is a question of law. But the issue in this case is not the "ultimate" question of whether an offense under the Virginia non-generic burglary statute might nevertheless constitute "generic burglary" under the ACCA; we know the answer to that question. The question in this case, however, which requires no *legal analysis* but rather a *factual analysis*, is whether the district court clearly erred in finding that the government failed to satisfy its burden of proof (as constrained by *Shepard*) to establish that two of Foster's prior offenses were generic burglaries. *See also* Govt's Corr. Response Pet. Reh. En Banc at 8 (conceding that "the government bears the burden of proving an ACCA predicate offense by a preponderance of the evidence").

Of even more particular and compelling salience in the context of this case, Judge Wilkinson (joined by Judge Motz) recently demonstrated conclusively that determinations by a district court of what a *Shepard*-approved document establishes (as in this case) are quintessential *factual* questions subject to the clear error standard of review. *See United States v. Taylor*, 659 F.3d 339, 348 n* (4th Cir. 2011).

In *Taylor*, the majority rejected my argument in dissent that the *Shepard*-approved document, there a guilty plea transcript, was insufficient to establish that the underlying conviction was a crime of violence under the ACCA, and reasoned as follows:

> Before us is simply the question of whether the district court properly concluded from the relevant

*Shepard* documents that Thompson's prior conviction was a qualifying predicate. In the course of *making that finding*, we believe the district court was entitled to rely on those facts and circumstances in the plea colloquy *it felt relevant. . . .*

The sole question therefore is whether the district court made *a proper finding* that Thompson's second degree assault conviction was for a crime of violence. We think without question that *the trial court made that finding* and that the plea colloquy amply supports its conclusion.

*Id.* (emphases added).[2]

What the district court did in this case is exactly what the district court did in *Taylor*; it examined *Shepard*-approved documents in order to make a *finding of fact*, except that the district court's finding in this case was *against* the government rather than *in favor* of the government. I presume all agree that this distinction alone is hardly a reason to reverse the district court in this case.[3]

---

[2]In my dissent, I argued that the district court committed an error of law in its reliance on the *Shepard*-approved document to make its finding that the appellant's second-degree assault conviction in violation of Maryland law was a "crime of violence" under the ACCA. *See* 659 F.3d at 349, 352 & n.6. The majority concluded, to the contrary (as recounted above), that the district court committed no error of law and that the *Shepard*-approved document was sufficient to support the district court's finding that the prior conviction was a qualifying offense under the ACCA.

[3]As the Supreme Court stated in *Anderson v. Bessemer City*, 470 U.S. 564 (1985):

Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*This is so even where the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.*

Notably, the parties have not had an opportunity to brief *Taylor*'s effect on the issues in this case because the briefing and argument before the panel in this case were concluded well before *Taylor* was published on October 24, 2011. If en banc rehearing had been granted, we would have had the benefit of counsel's arguments on the effect on this case, if any, of *Taylor*'s application of the clear error standard. The failure of one more circuit judge in regular active service to vote in favor of rehearing erects an impenetrable bar to that extraordinary opportunity. Injustice sneaks up on us in so many ways.

Thus, and in any event, the question presented here is a question of fact, as the majority's resort to "judicial notice" of geographic features of a county in the Commonwealth of Virginia makes clear. *Cf. Ohio Bell Tel. Co. v. Pub. Util. Comm'n of Ohio*, 301 U.S. 292, 301 (1937) ("[N]otice, even when taken, has no other effect than to relieve one of the parties to a controversy of the burden of resorting to the usual forms of evidence."). Accordingly, if the judges of this court believe the district court committed clear error they should say so, but they should not, *sub silentio*, alter (any more than they should misapply) our well-established standard of review of the multi-faceted process of district court sentencing.

This case is a first, so far as I can tell. Although we have found it necessary, of course, to elucidate the applicable legal standards of sentencing enhancement law, in my canvass of our post-*Shepard* ACCA, career offender, and guidelines-offense-enhancement cases, I cannot locate an instance in

*Id.* at 574 (emphasis added) (citations omitted); *see also Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120, 126 (4th Cir. 1994) (quoting this language from *Anderson* and stating, "This [is] the law"); *United States v. Houman*, 234 F.3d 825, 827 (2d Cir. 2000) (per curiam) (citing *Anderson* and stating, "We review the district court's factual finding as to the nature of the 1975 conviction under a clear error standard, notwithstanding the fact that the findings were based entirely upon documentary evidence.").

which this court, in a published opinion, outright reversed a district court's finding of fact underlying its determination that the government failed to carry its burden of proof to show that an offender was eligible for the applicable sentencing enhancement. *See United States v. Donnell*, 661 F.3d 890 (4th Cir. 2011) (reversing for legal error); *United States v. Vann*, 660 F.3d 771 (4th Cir. 2011) (en banc) (same); *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc) (same); *United States v. Peterson*, 629 F.3d 432 (4th Cir. 2011) (same); *United States v. Clay*, 627 F.3d 959 (4th Cir. 2010) (same); *United States v. Rivers*, 595 F.3d 558 (4th Cir. 2010) (same); *United States v. Alston*, 611 F.3d 219 (4th Cir. 2010) (same); *United States v. Bethea*, 603 F.3d 254 (4th Cir. 2010) (same); *United States v. Thompson*, 588 F.3d 197 (4th Cir. 2009) (same, rejecting district court's legal conclusion that circuit precedent had been abrogated by *Begay v. United States*, 553 U.S. 137 (2008)); *United States v. Roseboro*, 551 F.3d 226 (4th Cir. 2009) (vacating imposition of enhanced sentence upon concluding that *Begay* did abrogate circuit precedent); *United States v. Harcum*, 587 F.3d 219 (4th Cir. 2009) (reversing for legal error); *United States v. Thornton*, 554 F.3d 443 (4th Cir. 2009)(same); *see also United States v. McQueen*, 445 F.3d 757 (4th Cir. 2006) (reversing district court's refusal to impose ACCA sentence "without any analysis" and holding that ostensible restoration of defendant's civil rights was trumped by "his repeated felony offenses over time"); *United States v. Green*, 436 F.3d 449 (4th Cir. 2006) (reversing district court's refusal to impose career criminal sentence upon concluding that "district court erred as a matter of law" in applying guidelines); *United States v. Washington*, 404 F.3d 834 (4th Cir. 2005) (reversing, under plain error standard, in the circuit's first application of *Shepard*, district court's offense level enhancement for § 922(g)(1) conviction in reliance on non-*Shepard* sources).

In contrast, it is no coincidence that, with one exception, every one of the circuit court cases cited by the majority in the panel opinion in this case (and now parroted by the govern-

ment, *see* Govt's Corr. Response Pet. Reh. En Banc at 10-11) in support of the majority's reversal of the district court's finding under the ACCA that the government failed to carry its burden of proof was an *affirmance* of the lower court's imposition of an enhanced sentence. *See United States v. Baxter*, 642 F.3d 475 (4th Cir. 2011); *United States v. Proch*, 637 F.3d 1262 (11th Cir. 2011); *United States v. Rainer*, 616 F.3d 1212 (11th Cir. 2010); *United States v. Miller*, 478 F.3d 48 (1st Cir. 2007); *United States v. Letterlough*, 63 F.3d 332 (4th Cir. 1995).[4]

In the one exception to the pattern described in the above paragraph (of the panel majority citing cases which *affirmed* the imposition of an enhanced sentence to support the *reversal* of a refusal to impose an enhanced sentence), *United States v. Aguila–Montes de Oca*, 655 F.3d 915 (9th Cir. 2011) (en banc), the district court's imposition of an enhanced sentence was *reversed* on appeal. *Id.* at 917, 946, 973-74 (Opinions of Bybee, J., and Berzon, J.) (concluding that the *Shepard*-approved documents before the district court did not support its finding that defendant had been convicted of generic burglary under California law). Turning ostensible persuasive authorities on their heads and extracting *obiter dicta* from them in order to reverse the district court in this case is peculiar, to say the least.

---

[4]My opinion in *Baxter*, 642 F.3d at 476, provides no support for the panel's reasoning or outcome, in any event. The word "shop" appearing in the Virginia burglary statute also appeared in the indictment in the prior prosecution in *Baxter*. Thus, the issue presented was a pure *legal* issue: whether, under federal law, as it absorbs the Virginia Supreme Court's binding interpretation of the elements of state law (*see Vann*, 660 F.3d at 777), a "shop" is a "building." The Virginia Supreme Court had so held in *Graybeal v. Commonwealth*, 324 S.E.2d 698, 700 (1985), and we affirmed the district court's adherence to that ruling in *Baxter*. 642 F.3d at 477.

No factual question whatsoever was presented in *Baxter*, and therein lies the problem in any attempt to apply it here.

In short, like the burden of proof at the trial stage, the standard of review at the appellate stage is the coin of the realm. We ought not lightly permit corrosive influences, arising out of understandable dissatisfaction with substantive legal doctrines, to denude the value of that currency.

## II.

Second, by rule we deem unpublished opinions "non-precedential" for several very good reasons. 4th Cir. R. 32.1; *see also United States v. Hayes*, 482 F.3d 749, 751 n.7 (4th Cir. 2007) (citing 4th Cir. R. 32.1 for proposition that pre-2007 unpublished opinion is not controlling precedent), *reversed and remanded on other grounds*, 129 S. Ct. 1079, 1089 (2009). Applying the rule, Judge Duncan recently wrote, in *Minor v. Bostwick Laboratories, Inc.*, __ F.3d __, No. 10-1258, slip op. at 8 n.6 (4th Cir. Jan. 27, 2012), "we decline to address the arguments Bostwick bases upon [a prior unpublished opinion]." The prominent role of the unpublished opinion relied on by the panel majority here, *United States v. Shelton*, 196 F. App'x 220 (4th Cir. 2006) (unpublished) (and now parroted by the government, *see* Govt's Corr. Response Pet. Reh. En Banc at 11), is troubling on several levels.

The majority devotes an entire paragraph to that non-precedential case and accords it unwarranted gravitas:

> This conclusion is augmented by our prior decision in *United States v. Shelton*, 196 F. App'x 220 (4th Cir. 2006) (unpublished). In *Shelton*, we concluded that an indictment charging the defendant with breaking and entering "the business of All American Car Wash" established that the prior conviction was for a generic burglary: "[w]e believe the reference to 'the business' necessarily ensures that Shelton sought to enter 'a building or structure.'" *Id.* at 222. If the broad term "business" in *Shelton* sufficiently

defined a generic burglary, so too should the more explicitly named businesses in the case at bar.

662 F.3d at 295-96.

Manifestly, this is inconsistent with the letter and certainly the spirit of our local rule, particularly regarding a case, such as *Shelton*, that was not even orally argued. This is even more true in a case in which the district court specifically considers a non-precedential case and, in reliance on its non-precedential character, declines to follow it. *See United States v. Foster*, 732 F. Supp. 2d 649, 653 (W.D. Va. 2010) ("[C]itation of unpublished decisions issued prior to January 1, 2007, is disfavored, 4th Cir. R. 32.1, and accordingly *Shelton* does not control the present case.") (citation omitted).

We should not put district courts in such a Catch-22, which is to say we certainly should not treat non-precedential, unpublished opinions as if they were otherwise in a case in which we reverse the district court for treating a non-precedential opinion as if it were non-precedential, as indeed it is. In any event, the fact that we affirmed the district court in *Shelton* says no more than that the court did not clearly err in finding the government had carried its burden of proof. From an institutional perspective, it is unseemly, to say the least, to promote a non-precedential prior opinion when a subsequent panel agrees with its reasoning or outcome, as in this case, only to summarily "decline to address" such an opinion when a subsequent panel disagrees with its reasoning or outcome, as in *Minor*. After all, as Emerson wrote, it is only "*foolish* consistency" that is "the hobgoblin of little minds." Playing an insidious game of "Gotcha" with the district courts in this circuit is no way to run a judicial railroad.

### III.

Third, I think that reversing a district judge for his lack of "common sense," or because he "abandon[ed] logic," if ever

appropriate, is to be reserved for the most extreme cases. This is not one of those cases. I have little doubt that the panel's majority and concurring opinions intend this meaning by their profligate invocation of these terms. *See ante* at 10 (Motz, J., dissenting). And I believe there is a high risk that many readers, both casual and knowledgeable, will view it this way. Again, if there was clear error, the court should say so in a forthright manner. It should not hide behind a misapplication of the de novo standard of review, accompanied by insincere salutes to "common sense" and "logic."

To be sure, as Judge Wilkinson recently reminded us, "[a] judge's toolkit includes common sense." *United States v. Montieth*, 662 F.3d 660, 668-69 (4th Cir. 2011). At the same time, however, "common sense" is no judicial panacea or magic wand. *See Pagan v. Fruchey*, 492 F.3d 766, 778 (6th Cir. 2007) (en banc) ("A judicial pronouncement that an ordinance is consistent with common sense hardly establishes that it is so.").

As Judge Motz demonstrates, common sense has not been appropriately invoked to justify a reversal in this case. In any event, contrary to any suggestion that the district court lacked common sense, the distinguished district judge brought to bear the full breadth of his knowledge, experience, insight and wisdom in conducting the sentencing hearing in this case. As he noted both at sentencing and in his written opinion, the offenses leading to the disputed convictions were committed when the defendant was 19 years old and that the defendant had no further felony convictions in the 19 years between those convictions and the present conviction. *Foster*, 732 F. Supp. 2d at 651 n.1. The court did an exemplary job of explaining its sentencing decision in this case, in which the defendant had a hunting rifle in his car.

It may well be that the district court was outraged, and justifiably so, at the thought that Foster should serve a 15-year sentence for his offense (rather than the 27 months imposed),

but no view of the district court's handling of this case could reasonably support the conclusion that the court acted lawlessly in adjudicating this case. So that the whole world will see the genuine attention and evenhandedness the district court brought to its task in this case, I attach as an appendix to this opinion a reproduction of a part of the transcript of the sentencing hearing reflecting the court's statements.

\* \* \*

In sum, I am convinced this record militates strongly in favor of rehearing. "[I]f the primacy of trial courts in the sentencing process envisioned in *Gall* is to be respected, the district court's reasonable conclusions from a *Shepard*-approved document must be upheld." *Taylor*, 659 F.3d at 348 (Wilkinson, J.). This is no less true when the defendant prevails on factual determinations under *Shepard* as when the government prevails. The panel majority's mistaken assertion that the proper standard of review here is de novo goes unremedied and Foster, close to (or already) released from federal prison, will be ordered to report, again, to the United States Marshal to serve an additional twelve-plus years in prison imposed by a couple of federal judges he has never seen before and who have never looked him in the eye.[5] Nevertheless, we can be sure that, soon enough, when the government next prevails on a disputed question arising from a district court's interpretation of the facts in a *Shepard*-approved document, government prosecutors will bound up the steps of our courthouse and earnestly implore us to apply a clear error standard of review. And the government will be right to ask us to do so. Only the fog of injustice beclouding this moment impedes our ability to see that this is so.

The result here is inconsistent with Supreme Court prece-

---

[5]Good faith disagreements over the application of legal doctrine to one side, it is unimaginable how the result here might be genuinely "pleas-[ing]." *See ante* at 8 (Wilkinson, J.).

dent; incompatible with circuit rules and long-settled understandings; and will be incomprehensible to the communities we serve. Because en banc review plainly is required here to maintain uniformity in our jurisprudence and to address issues of exceptional importance, I dissent from the refusal of the court to grant the petition for en banc rehearing.

Judge Gregory joins in this dissent.

**APPENDIX TO
OPINION OF DAVIS, J.,
DISSENTING FROM THE DENIAL OF
REHEARING EN BANC**

*UNITED STATES v. JOHN JOEL FOSTER*
**CASE NO. 10-5028**

**UNITED STATES COURT OF APPEALS FOR
THE FOURTH CIRCUIT**

**THE COURT:** Well, if there's nothing further, I am prepared to impose sentence at this time. Mr. Foster, if you will stand, sir. Mr. Foster, is there anything that you wish to say to me before I pronounce sentence in your case?

**THE DEFENDANT:** No, sir.

**THE COURT:** Well, the following are the reasons for the imposition of the sentence in this case: I've carefully considered the factors set forth in 18, United States Code, Section 3553(a), as well as the sentencing range established in this case by the advisory sentencing guidelines.

The parties have made the following arguments as to the appropriate sentence, which I've also considered. The government argues that I should impose a sentence above the advisory guideline range as a variance, on the ground that the guideline range is far below the mandatory minimum sentence otherwise provided for in the Armed Career Criminal Act, and that, accordingly, since I ruled that the Armed Career Criminal Act was not applicable to Mr. Foster's case, I should consider a higher sentence than the guideline range.

Of course, the Armed Career Criminal Act was not established by the sentencing commission and has no direct refer-

ence to the factors set forth in 18, United States Code, Section 3553(a). It is a statute that requires a mandatory minimum regardless of the history and characteristics of the defendant or the other factors set forth in the statute, and I do not believe that that is an adequate basis for considering those factors in the appropriate sentence in this case.

In fact, I believe it would be unjust to impose a sentence mandated by the Armed Career Criminal Act to the defendant, since I have found that it is not applicable to him and that there are no other circumstances, in my view, which would justify such a sentence.

Now, the government also argues that the defendant's criminal history underrepresents the seriousness of his prior criminality. I'm not sure whether the government requests an upward departure within the meaning of the guidelines or simply an upward variance. But in either event, I do not believe such a course would be appropriate in this case, although, of course, I have the discretion to do so.

The prior convictions of the defendant which I considered in regard to the application of the Armed Career Criminal Act occurred when the defendant was 19 years old, many years ago. They involve a series of break-ins to businesses that occurred in the same geographical area over a relatively short period of time. There's no indication that such crimes or types of crimes such as these have occurred since then in the defendant's life.

His problem since then has been one of substance abuse, which I'll get into in a moment. But there's no indication that, since the age of 19, that he has engaged in break-ins or thefts or other property offenses such as described in the presentence report, so I do not believe that those offenses which occurred, again, years ago indicate that his criminal history, as calculated under the advisory sentencing guidelines, underrepresents his criminality.

The government also argues that I should sentence the defendant above the advisory guideline range because in 2006 he was convicted of possession of marijuana, and the facts indicated that a search of his residence discovered ten marijuana plants, which could have been prosecuted as a felony, but through plea bargaining he was convicted of a misdemeanor.

Well, in the first place, we don't have any idea about why the state prosecutor agreed to a misdemeanor conviction and the court placed the defendant on probation. I would have to presume that there was good reason for that. And normally when a plea bargain to a misdemeanor occurs, it reflects perhaps a problem with proof of a more serious offense, or the defendant's conduct, his personal history and characteristics indicate leniency is indicated.

But in either event, I do not believe that it would be appropriate for me to impose a sentence above the advisory guideline range because it is theoretically possible that the defendant may have been convicted of a felony in 2006.

Now, I believe that the guideline calculation, to which there has been no objection other than the government's request that I impose a mandatory sentence under the Armed Career Criminal Act, adequately reflects the factors set forth in Section 3553(a), and for that reason, I intend to follow the argument of the defendant and impose a sentence within the advisory guideline range.

Now, in particular, the defendant has requested a sentence at the low end of the guideline range. One of the factors I must consider is, under the statute, a sentence that would provide the defendant with needed correctional treatment in the most effective manner, including medical care.

As I've indicated, the defendant's problem has been his substance abuse problem. As the presentence report indicates,

he has a long history of alcohol and drug-related problems, and I believe that the defendant needs treatment while incarcerated. I'm going to recommend to the Bureau of Prisons that the defendant be subjected to the residential substance abuse program available in the Bureau of Prisons.

Accordingly, I believe that a sentence at the high end of the guideline range would make it more likely that the defendant could receive appropriate treatment while incarcerated.

I would urge the defendant to take advantage of such a program, or any other programs that are available to him while he's incarcerated, so that when he gets out, he will be able to make sure that his substance abuse problems don't lead him into the same type of trouble that he is in in this case.

Accordingly, for the reasons stated, it is the judgment of the Court that the defendant, John Joel Foster, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 27 months. The Court will recommend to the Bureau of Prisons that the defendant be enrolled in the residential substance abuse treatment program.

The defendant has performed all the conditions of his bond, and I will accordingly recommend to—accordingly, I will permit him to self-report to the institution designated by the Bureau of Prisons upon notification.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.

WYNN, Circuit Judge, dissenting from the denial of rehearing en banc:

Unfortunately, this Court, equally divided, refuses to grant rehearing en banc in this case. I write now not to address why I believe the panel majority was incorrect; rather, I write to point out why this case is particularly well suited to be considered by the full Court, irrespective of whether one agrees or disagrees with the panel majority opinion.

To warrant an en banc rehearing, Appellate Procedure Rule 35 requires that en banc consideration be "necessary to secure or maintain uniformity of the court's decisions" or that the issues at hand are "of exceptional importance." Fed. R. App. P. 35. Stated differently, a rehearing en banc is not contingent on disagreement with the panel majority. Instead, the rule mandates simply that due consideration by the full Court is warranted when an issue is sufficiently important, or there is enough tension between the opinion and other Circuit precedent.

This case easily clears both hurdles. First, this case is of exceptional importance, because, among other things, it raises important Sixth and Fourteenth Amendment issues. As has already been well covered, in circumstances remarkably similar to those in this case, the Supreme Court, in *Shepard v. United States*, 544 U.S. 13 (2005), expressly prohibited courts from making findings of fact not directly apparent from a charging document, the terms of a plea agreement, or some comparable judicial record. *Id.* at 26. As Justice Souter noted in his opinion, anything else has serious constitutional implications:

> [T]he Sixth and Fourteenth Amendments guarantee a jury standing between a defendant and the power of the State, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence. While the disputed fact here can

be described as a fact about a prior conviction, it is too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to *Jones* and *Apprendi*, to say that *Almendarez- Torres* clearly authorizes a judge to resolve the dispute. The rule of reading statutes to avoid serious risks of unconstitutionality, therefore counsels us to limit the scope of judicial factfinding on the disputed generic character of a prior plea, just as *Taylor* constrained judicial findings about the generic implication of a jury's verdict.

*Id.* at 25-26 (opinion of Souter, J.) (citation omitted). The fundamental constitutional rights implicated here are exceptionally important.

Second, numerous judges on this Court join in Judge Motz's dissent to the denial of rehearing en banc, which expresses the view that the panel majority squarely conflicts with controlling Supreme Court precedent. Likewise, the panel majority is in serious tension with our own Court's case law, including *United States v. Washington*, 629 F.3d 403, 409-10 (4th Cir.) (noting "the animating purpose[ ] of the *Taylor/Shepard* line: the desire to avoid extensive litigation about prior convictions at sentencing" and recognizing the "canonical set of records" upon which courts may rely under *Shepard*), *cert. denied*, 132 S. Ct. 127 (2011), and *United States v. Bethea*, 603 F.3d 254, 259-60 (4th Cir. 2010) (rejecting the "most plausible explanation" and common use of the term "escape" and focusing solely on whether *Shepard*-approved documents necessarily showed that the defendant had committed the type of violent conduct required under the Armed Career Criminal Act ("ACCA")).

The sheer fact that this Court's vote on this en banc rehearing petition is 7-7 itself indicates that this case is important and warrants this Court's full attention. Fully half of this Court's judges deem this matter worthy of being one of only

a handful of cases, at most, that the Court hears en banc in a given year. That the 7-7 split of the rehearing vote could indicate that a fractured decision may ultimately arise from rehearing (which is in no way assured, since voting whether rehearing en banc is warranted should not be a vote on the merits, as my previous Rule 35 discussion notes) is no reason to shy away from rehearing this case. Indeed, were the Supreme Court to take such a view and dodge contentious issues, many of the most pressing cases would never get Supreme Court review. And it seems to me that it is precisely those difficult cases that benefit most from every considered view, i.e., from rehearing by the full Court.

Moreover, I cannot help but wonder what the precedential value of the panel majority opinion is. First, there is the consideration that Judge Wilkinson writes a concurring separate opinion that does not address directly why en banc review should be denied but instead sets forth his considered thoughts on why "the panel majority here committed no *Shepard* error." Opinion of Wilkinson, J. at 4. In short, though Judge Wilkinson votes to deny this Court the opportunity to review this matter, he nonetheless writes an opinion that concurs in the majority panel opinion. To use his own words in this context, he is "quick to heap opprobrium" on voting to allow the merits to be addressed by the full Court, yet engages in precisely that, which he has denied the full Court, by issuing an opinion that concurs in the panel majority opinion.[1]

---

[1]The concurring opinion states that the dissenters "are quick to heap opprobrium on the exercise of the obvious, but slow to suggest what the Corner Market and Sunrise-Sunset Restaurant might be other than buildings or structures." Opinion of Wilkinson, J. at 5. To the contrary, footnote 2 of my dissent from the panel majority opinion does indeed suggest "what the Corner Market and Sunrise-Sunset Restaurant might be other than buildings or structures." *Id.* Of course, those suggestions were not necessary to the analysis because the appropriate inquiry is whether the market and restaurant at issue must *necessarily* be buildings.

Too, Judge Motz and Judge Davis have issued opinions which, like that of Judge Wilkinson, do not directly address why en banc review should be allowed. But unlike Judge Wilkinson, they vote to allow all of the other members of this Court the opportunity to address the merits of the underlying appeal, as they do in their respective opinions.

Additionally, Judge King, Judge Gregory, Judge Davis, Judge Keenan and Judge Floyd all concur in Judge Motz's dissenting opinion. Judge Gregory also concurs in Judge Davis's dissenting opinion. With Senior Judge Hamilton[2] (who also wrote a separate opinion concurring in the panel majority opinion) joining in Judge Agee's panel majority opinion, and my dissent from the majority panel opinion, ten judges have now expressed their opinions on the merits of the underlying appeal, not just on the decision to deny rehearing.

That leaves the order denying a rehearing en banc essentially affecting only the remaining five judges who have neither written nor joined an opinion that concurs or dissents from the panel majority opinion. I suppose if those five judges were to align themselves with any of the opinions arising from this poll, this Court would effectively have conducted an en banc review—only without having given the parties access to the full Court via oral argument to express their views.

Further, what guidance does the panel majority opinion provide, for this Court and for district courts, going forward? Is using "common sense" required, or merely discretionary? Even were employing "common sense" mandatory, different judges will almost surely have different notions of "common

---

[2]Per the Fourth Circuit Judges' Handbook, "[o]nly active judges may vote in a poll." However, because Senior Judge Hamilton "was on the original panel that decided the case[,]" the Handbook provides that he may "continue[ ] to participate *after* rehearing en banc is granted." *Id.* at 22 (emphasis added). Thus, a senior judge may not participate in any manner during the polling of this matter; instead, a senior judge may participate only if "rehearing en banc is granted." *Id.*

sense and experience," "resulting in a totally subjective standard . . . ." *Jacobs v. Tempur-Pedic Int'l, Inc*., 626 F.3d 1327, 1346 (11th Cir. 2010) (Ryskamp, J., dissenting). The outcome of a "common sense" inquiry in any given case will therefore likely depend, at least in part, on the identity of the district court judge or the appellate panel members—a troubling consequence indeed.[3]

I appreciate that rehearing en banc "is not favored" and is the exception rather than the rule. Fed. R. App. P. 35. Nevertheless, rehearing en banc is an important tool for giving difficult issues the benefit of every considered view. In considering rehearing requests, the inquiry should not be, "would I have voted differently than the panel majority," but rather, "is the issue this case presents particularly important or in tension with precedent." *See id.* With all due respect to my good colleagues voting to deny the full Court an opportunity to confront the issues in this case, the correct answer here, particularly when viewed irrespective of inclinations on the merits, is a resounding yes.

I must therefore respectfully dissent from the denial of a rehearing en banc. Judge Gregory and Judge Davis have authorized me to indicate that they join in this dissent from the denial of rehearing en banc.

---

[3]That is why the advice posited by the concurring opinion that "a policy disagreement with the ACCA" is a matter "to be taken up with Congress," Opinion of Wilkinson, J. at 8, is advice that should be directed to the majority panel opinion, in which the concurring opinion joins. Instead of reading the language of the ACCA and pertinent statutes and case law as they are written, the majority panel imports its own notions of "common sense" into the equation. Indeed, "common sense" as used by the majority panel here is little more than a thinly veiled public policy decision. The majority panel would therefore seem to be well served by the concurring opinion's misdirected advice: "Theirs is a policy disagreement" that should "be taken up with Congress." *Id.*